OPINION
On January 29, 1998, Jill D. Schottenstein filed a complaint in the Franklin County Court of Common Pleas, Division of Domestic Relations, seeking a divorce from Steven Schottenstein, to whom she had been married since April 1983. Mr. Schottenstein, in turn, responded with the filing of a counterclaim in March 1998. The record before us indicates that the divorce action remains pending. The instant appeal arises from the trial court's disposition of a contempt motion filed by Mr. Schottenstein.
The Schottensteins have three minor children: Sarah, born February 1986; Ashley, born June 1987; and Abby, born November 1988. At the time of the March 2000 hearing giving rise to the instant appeal, the girls were ages 14, 12, and 11, respectively. The children, represented by their own counsel, were ultimately joined as third-party defendants in the divorce action. A guardian ad litem had previously been appointed.
Temporary orders pertaining to financial support and the allocation of parental rights were originally issued in March of 1998. At that time, Ms. Schottenstein was designated the temporary residential parent and legal custodian of the children. Mr. Schottenstein was granted visitation/companionship on alternate weekends and two evenings each week.
The Schottensteins soon entered into another agreement, pursuant to which each parent was designated as residential parent with a "week on/week off" possessory time. However, this arrangement ended in August 1998 when the trial court terminated most of Ms. Schottenstein's contact with the children following the filing of a motion by the guardian adlitem. Pursuant to a magistrate's order entered August 6, 1998, Mr. Schottenstein was designated the residential/custodial parent, and Ms. Schottenstein was initially limited to telephone contact with the children. The trial court subsequently modified this order to permit limited visits between Ms. Schottenstein and the children.
Ultimately, an agreed order was journalized in November 1998, whereby Mr. Schottenstein was designated the residential/custodial parent, and the parties returned to the alternating week on/week off visitation schedule.
On February 23, 2000, Mr. Schottenstein filed a motion seeking a contempt finding against Ms. Schottenstein for her purported interference with his custody of the children. Specifically, Mr. Schottenstein claimed that Ms. Schottenstein failed to comply with the November 1998 order by refusing to return the children to him as scheduled.
A hearing on the contempt motion was conducted on March 7, 2000. Both Mr. and Ms. Schottenstein testified at length regarding their respective versions of events culminating in the contempt action. Both counsel for the children and counsel for Ms. Schottenstein sought to call the children as witnesses or, in the alternative, to have the judge interview the children in chambers. The guardian ad litem and Mr. Schottenstein's counsel objected to the children's participation in the proceedings. The trial court ultimately refused to hear from the children, either in chambers or as sworn witnesses, finding the testimony of the children regarding their opinions and desires to be "irrelevant." On behalf of both the children and their mother, the children's counsel proffered the testimony anticipated from the three girls.
On March 8, 2000, the trial court journalized an entry in which it determined that Ms. Schottenstein was in contempt due to her interference with Mr. Schottenstein's custody/companionship rights. As a result, the trial court "sentenced [Ms. Schottenstein] to the following punishment:"
 A. [Ms. Schottenstein] is sentenced to 20 days in the Franklin County jail to be commenced immediately;
 B. This jail sentence is suspended based upon the following purge conditions:
 1). [Ms. Schottenstein] shall complete the transfer of all three girls to [Mr. Schottenstein] by 4:30 p.m. on Wednesday, March 08, 2000;
 2). [Ms. Schottenstein] shall refrain from taking the girls to school or from school for the balance of the purge period;
 3). [Ms. Schottenstein] foregoes the next three weeks of her scheduled time as compensatory time for [Mr. Schottenstein] [Ms. Schottenstein] shall have no visitation with the children on her scheduled weeks beginning March 13, 2000, March 27, 2000[,] and April 10, 2000;
 4). [Ms. Schottenstein] shall not remove the children from Franklin County for the balance of the pendency of these proceedings;
 5). [Ms. Schottenstein] shall pay directly to [Mr. Schottenstein's] counsel the sum of $1,500 within 30 days of this order as reasonable attorney fees based upon this court's knowledge of reasonable rates and the time expended in hearing on March 7, 2000;
 6). [Ms. Schottenstein] shall pay directly to the clerk of this court a fine in the amount of $500 within 10 days of this order. [Entry at 6-7.]
A "joint notice of appeal" was filed on behalf of Ms. Schottenstein and the minor children. Counsel for the children has assigned two errors for our consideration:
 Assignment of Error No. I
 The trial court committed prejudicial error by prohibiting the appellant and the attorney advocate for the children from calling the minor children as witnesses in the contempt hearing.
 Assignment of Error No. II
 The trial court erred in the sanctions imposed in finding the appellant guilty of contempt.
 A. The trial court erred as a matter of law by imposing criminal sanctions in a civil contempt proceeding.
 B. The trial court erred as a matter of law by modifying the companionship order as part of the purge order.
Counsel for Ms. Schottenstein has assigned three substantially similar errors:
Assignment of Error No. 1
 The trial court erred to the prejudice of appellant by denying appellant her right to present the testimony of the children as part of her defense to the charge of contempt.
 Assignment of Error No. 2
 The trial court erred and abused its discretion by finding appellant in contempt of court.
 Assignment of Error No. 3
 The trial court erred and abused its discretion by issuing a purge order and punishment that was inappropriate and illegal.
By their first assignments of error, appellants collectively contend that the trial court committed prejudicial error by prohibiting Ms. Schottenstein from calling the minor children as witnesses in the contempt hearing or, in the alternative, by failing to hear the children in chambers.
The trial court ruled that the testimony of the children regarding their desires not to visit with their father would be irrelevant to Ms. Schottenstein's defense in the contempt action. Further, the trial court found that even if the testimony were deemed relevant, citing Evid.R. 403(B), the "danger of delay and harm to the children clearly outweighed the probative value of the testimony sought to be elicited."
The children's counsel proffered the following testimony, which we quote at length for purposes of establishing a factual foundation and given the proffer's potential significance:
 Obviously, Your Honor, I cannot proffer all the testimony the Schottenstein children may have testified to in this proceeding, but the following is a condensed version of what I would have expected to elicit from the children should they have testified.
 The Schottenstein children Sarah, Ashley and Abby would testify that things have gotten worse instead of better during this period of time. The past two years have been extremely difficult, stressful and confusing for them. They do they do not understand the judicial process and why their voices have not been heard and they do not believe the Court nor the guardian or their father have been acting in their best interest.
 Since October of 1998, they have been operating under a companionship schedule of one week on and one week off with each parent. They do not like the schedule. They do not understand why they have to spend time with babysitters when they could spend time with their mother.
 One of the of their biggest concerns, they would testify to this Court, is that besides the babysitter issue, is their father's temper and impatience with them. They would testify that their father yells at them a lot and believe that he has been physical with them in the past. This is frightening to the girls.
 They do not understand why this issue has never been addressed by this Court.
 The girls would further testify they thought when they moved from their father's apartment into his new home at the end of January 2000 things would get better for them. However, once they moved into their father's house, they found that it did not get better and, in fact, it became unbearable for them. Their father's impatience with them increased rather than decreased after the move; their father was constantly yelling at them about every little thing. They were afraid their father's temper would result in someone getting hurt. They were frightened and scared.
 The girls would further testify they spend a lot of time in their their rooms to get away from their father and his yelling at them.
 After the move, the girls would also testify that their father was travelling more during the week and would arrive home later in the evening. They were spending more time with the babysitter instead of less time as promised by their father.
 Sarah would testify the last straw for her was when her parents were to go to Columbus School for Girls for her high school orientation and scheduling for next year. Her father was out of state and his plane was delayed and Sarah's father was unable to attend the event and sent the babysitter, Kathy Schmidt, in his place, even though Sarah told her father that her mother would be there. Sarah would testify that this humiliated and embarrassed her in front of her peers at CSG and also the school staff, that her father would send a babysitter in his place to her high school orientation. This made Sarah very angry with her father.
* * *
 On February 16, Sarah walked to her mother's home instead of her father's, even though it was supposed to be his Wednesday evening companionship time. Sarah made this decision on her own without any any influence from her mother. She left a voice mail message for her father that she was not going to his house. * * *
 Sarah will state that her mother attempted to get her to go to her father's house but that she refused. She then spoke to her father on the telephone and he told her this was her decision, but it was the wrong decision and her mother would get in trouble because of this decision. Regardless of this telephone call, Sarah still refused to go to her father's.
 On Monday, February 21st, all the girls refused to go to [Mr. Schottenstein's] house for their week of companionship time.
 The girls would testify their mother made them get into her car and go to their father's house. When they arrived at their father's house, their mother got the luggage out of the trunk and told them regardless of what they were saying, it was their father's time and there was a court order to abide by.
 Sarah would testify her mother that she told her mother she was not going to go. And that she also told her father the same thing. Sarah got out of the vehicle to talk to her father; however, her sisters stayed in the car and refused to get out. Sarah would testify her father refused to talk to her outside and indicated that he would only talk to her if she came into the house. Sarah refused to do this.
 Her father went into the house and they stayed in their father's driveway for at least 20 minutes while they mother attempted to convince the girls to get them out of the car and into their father's house.
 Sarah would further testify that her father came back outside and asked the girls to come into the house to talk to him about the situation. However, the girls again refused. Their father then went back into the house and never came back out again.
 Sarah would further testify that on the following day, she called the Guardian ad litem to discuss her position on the matter. Sarah would testify the Guardian would not listen to her and only say her mother was going to be in serious trouble if she did not return to her father's. However, Sarah still refused to go still knowing that.
Sarah would testify this was her independent position.
 All the girls would testify they knew there would be serious consequences to face regarding their behavior, one of which they knew their mother could be sentenced to jail time; however, all the girls would testify that they continued to refuse to go back to their father's house.
 The girls would further testify that their mother has not influenced this decision. Their mother has asked them daily to return to their father's home but they have refused to do so.
 The girls would further testify that their refusal to go to their father's house is an independent decision; not the decision of their mother. The girls would testify they need a break from their father and the ongoing conflict between their parents and the ongoing conflict with the father.
 The girls would testify that by forcing them to go back to their father's would will not help the problems they are having at this time.
 Furthermore, I would proffer that if this Court can contact Dr. Beck, Dr. Beck would indicate he has recommended that the girls stay away from their father for a period of time. This has been proposed to Mr. Schottenstein but he will not agree to that matter. [Tr. 243-250.]
We are first guided by glaring due process concerns implicated here, particularly those specifically set forth in R.C. 2705.05(A), which requires, in relevant part:
 In all contempt proceedings, the court shall conduct a hearing. At the hearing, the court shall investigate the charge and hear any answer or testimony that the accused makes or offers and shall determine whether the accused is guilty of the contempt charge. * * * [Emphasis added.]
See, also, Rose v. Rose (Mar. 31, 1997), Franklin App. No. 96APF09-1150, unreported.
With these due process concerns in mind, this case involves far more than the question of whether or not Jill Schottenstein was in contempt of court when her three daughters did not return to their father's house for the week or weeks when they were supposed to be in the possession of their father. This case involves more than the question of whether or not Jill Schottenstein was in contempt when her fourteen-year-old daughter refused to go to her father's house for a mid-week visit with him. The case presents the situation where the courts have to address what rights a fourteen-year old, a twelve-year old, and an eleven-year old have to speak when they are placed in the middle of a hotly-contested divorce. The legislature has already addressed this issue in the context of allocation of parental rights and responsibilities when it enacted R.C. 3109.04(B), which reads:
 (B)(1) When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children. In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.
 (2) If the court interviews any child pursuant to division (B)(1) of this section, all of the following apply:
 (a) The court, in its discretion, may and, upon the motion of either parent, shall appoint a guardian ad litem for the child.
 (b) The court first shall determine the reasoning ability of the child. If the court determines that the child does not have sufficient reasoning ability to express his wishes and concern[s] with respect to the allocation of parental rights and responsibilities for the care of the child, it shall not determine the child's wishes and concerns with respect to the allocation. If the court determines that the child has sufficient reasoning ability to express his wishes or concerns with respect to the allocation, it then shall determine whether, because of special circumstances, it would not be in the best interest of the child to determine the child's wishes and concerns with respect to the allocation. If the court determines that, because of special circumstances, it would not be in the best interest of the child to determine the child's wishes and concerns with respect to the allocation, it shall not determine the child's wishes and concerns with respect to the allocation and shall enter its written findings of fact and opinion in the journal. If the court determines that it would be in the best interests of the child to determine the child's wishes and concerns with respect to the allocation, it shall proceed to make that determination.
 (c) The interview shall be conducted in chambers, and no person other than the child, the child's attorney, the judge, any necessary court personnel, and, in the judge's discretion, the attorney of each parent shall be permitted to be present in the chambers during the interview.
 (3) No person shall obtain or attempt to obtain from a child a written or recorded statement or affidavit setting forth the child's wishes and concerns regarding the allocation of parental rights and responsibilities concerning the child. No court, in determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child or for purposes of resolving any issues related to the making of that allocation, shall accept or consider a written or recorded statement or affidavit that purports to set forth the child's wishes and concerns regarding those matters. [Emphasis added.]
The three daughters had earlier expressed their strong desires to live with their mother when the court was considering the allocation of parental rights and responsibilities for purposes of the final decree of divorce. However, the final decree of divorce had not been issued or journalized at the time the trial court was presented with this contempt. The parties had been operating under the modified temporary order which named the father, Steven Schottenstein, the residential parent and were still doing so as of the time this case was argued before this appellate court almost two years after the modified temporary order was journalized. The three young women could justifiably have felt that their opinions counted for nothing, or at least had been given little weight up to that point in time.
Divorces are difficult times for children, whether young or adolescent. The children have little or no control over what is happening in their worlds. They have little or no control over what is happening between their parents. They have little or no control over basic aspects of their everyday lives, such as where they live or go to school.
Divorces also can lead to dramatic changes in the standard of living for the children, again leaving the children helpless to avoid the reduced standard of living that comes. At worst, the children blame themselves for the bad things happening to them and around them. A small child may feel that they are bad or bad things would not be happening to them. A more mature child may still harbor such a small child inside.
By the time a "child" reaches age fourteen, that "child" may be full grown and physically mature. Parents simply cannot use the same means to control a fourteen-year-old that can be used with a preschooler. The fourteen-year-old has to at least comprehend the will of the parents if cooperation is to be expected. In the context of the Schottenstein
case, the trial court should have at least interviewed the fourteen-year-old in order to ascertain her view as to what was happening in her world and why she felt she did not want to walk a short distance from her school to her father's new home to visit him or spend time with him.
The maturity of the children who were eleven and twelve at the time of the contempt proceedings is less clear. However, their need to feel that they had some control of their world could have been even greater. They had also expressed their desires to live with their mother and to be free of a schedule that moved them from house to house each week.
The trial court also should have considered taking the time to explain its ruling on the contempt to the three young women/girls. Although the guardian ad litem could normally fulfill this role, the guardian adlitem in the contempt hearing conducted himself in many ways as if he were a second attorney for the girls' father, cross-examining the mother in very hostile fashion at times.
The trial court ultimately entered a new order which threatened the mother of the girls with incarceration for twenty days and which threatened separating the girls from their mother for six weeks. A failure to explain this order could leave the young women with the impression that their attempts to express themselves had caused their mother to be jailed and them to be under the complete control and supervision of the parent they were trying to avoid. Under the circumstances, the trial court should have met with the girls, both to hear their views and then to explain later why their views did or did not have an impact on his ruling.
We no longer live in a time when children are mere chattels, with no rights and no inherent merit. We no longer live in a time when maxims such as "spare the rod and spoil the child" are generally accepted. Instead, a parent who uses a rod is at real risk of child abuse charges and/or loss of custody through juvenile court proceedings. For court orders to be effective, children the age of the Schottenstein girls have to at least accept the validity of the court's order. The trial court did not do enough to ensure acceptance and respect for its decision here.
As a result, the first assignments of error of the children and of Jill Schottenstein are sustained.
Once the trial court has the additional insights to be gained from the testimony and/or interviews of the three Schottenstein children, we cannot say whether the trial court will find the existence of a contempt of court. Some of the acts of Jill Schottenstein which seem to be in tension with the court order may seem less contemptuous if done for the purpose of avoiding a major public confrontation between Mr. Schottenstein and his daughters. Steven Schottenstein was the Chairman of the Board for the Columbus Torah Academy which his two younger daughters attended. A screaming match between him and his daughters in the school parking lot would have served no one's best interests. Both Mr. Schottenstein and his adolescent daughters risked being mortified by such an encounter.
As a result, we find the second assignment of error presented on behalf of Ms. Schottenstein to be moot. The trial court had sufficient evidence to support the finding it entered, but had improperly limited the evidence to be considered.
The remaining assignments of error address the purge order. We, by and large, cannot say that the purge order entered was illegal. However, the circumstances surrounding the purge order may have changed so significantly that the former purge order would not be appropriate.
We do find no basis in the record considered by the trial court for a purge order which includes a six-week total break in companionship between the girls and their mother. If this case proceeds to a hearing again and a contempt finding is entered, the trial court should fashion an order which does not involve a total cessation of contact for either party for an extended period of time. Intervening circumstances may make an order which compensates Mr. Schottenstein with additional time inappropriate due to additional time he may have received since the March 2000 hearing.
We find these assignments of error also to be moot. Specifically, we overrule as moot the Schottenstein children's second assignment of error and Ms. Schottenstein's third assignment of error.
Having sustained the first assignment of error on behalf of both the children and Ms. Schottenstein, this cause is reversed and remanded for further proceedings consistent with this opinion.
KENNEDY, J., concurs.
BOWMAN, P.J., concurs in part and dissents in part.